HEIRS OF JUANA SORBÁ CORUJO, Plaintiffs and Appellees, *v.* MANUEL VIÑAS ET UX., Defendants and Appellants.

No. 6416.   Argued December 11, 1934.—Decided November 8, 1935.

*E. H. F. Dottin* for appellants.   *Dubón & Ochoteco* for appellees.

MR. JUSTICE WOLF delivered the opinion of the court.

Antonio M. Sorbá died intestate on December 3, 1927, leaving as his heirs, his widow, Carmen Corujo, his daughter, Marcelina Sorbá Corujo de Viñas and his three

grandchildren who are the plaintiffs in this case and who inherited from their grandfather by representation of their deceased mother, Juana Sorbá Corujo. At the time of their grandfather's death, he had an account to his credit with J. Ochoa & Brother in San Juan, in the sum of $40,000, the result of certain deposits made by him for 10 or 15 years before his death in 1927. On the 17th of January, 1928, the partition of the estate took place and no reference was made by anyone to this large account. The evidence tends strongly to show that the plaintiffs were ignorant of its existence.

In February or March, of 1928, however, Manuel Viñas, one of the defendants herein and the husband of Marcelina Sorbá, the other defendant (so some of the testimony ran) went to J. Ochoa & Brother and upon inquiry as to the existence of the $40,000 account was informed by the cashier, Arturo González, that there was a certain document there with reference to the money. It reads as follows:

"We shall pay to don Antonio M. Sorbá at his residence in Santurce, P. R., on the 26th of November, 1932, the sum of FORTY THOUSAND DOLLARS that he has deposited with us to his credit, on which sum we shall pay interest at 7% annually payable monthly or whenever the creditor demands it after it has become due.

"It is expressly agreed, by request of the creditor, that if he should die before the maturity of this obligation, the interest accrued shall be payable to his legitimate daughter doña Marcelina Sorbá de Viñas. On maturity, the capital shall also be payable to said señora Sorbá de Viñas if she should so desire it. San Juan, P. R., November 26, 1927. (Signed) J. Ochoa & Hno."

Thus it will be seen that the document is signed only by the representative of J. Ochoa & Brother and not by Antonio M. Sorbá, who died a week after the date of the supposed execution thereof. From August 1928, to sometime in 1930, the interest due on the $40,000 and amounting to $8,400 was paid to the said daughter Marcelina Sorbá de Viñas, totally without the knowledge of the other heirs. On March 5, 1929,

the widow of Antonio M. Sorbá died and in her will made no reference to the said $40,000.

At the instance of creditors, J. Ochoa & Brother was adjudged a bankrupt on September 23, 1931. The evidence is uncontradicted that Marcelina Sorbá de Viñas in the bankruptcy proceedings filed in her own name a proof of claim for the $40,000 without ever disclosing to any of the co-heirs the existence of the said credit.

The present suit, essentially for accounting, was filed on April 8, 1932, and only then was it that the defendants offered to turn over to the plaintiffs the proportionate share of the interest that had been collected. Marcelina Sorbá then maintained that there had been no appropriation of the account and that it was partly on behalf of the heirs that she was filing the proof of claim against J. Ochoa & Brother. The District Court of San Juan rendered judgment in favor of the plaintiffs.

At the trial the evidence tended to show that whenever Antonio M. Sorbá deposited any sum of money with J. Ochoa & Brother he was given a receipt whereunder, conditioned on 30 days notice, he could at any time demand payment of the amount deposited. These deposit slips turned up in the hands of the cashier of J. Ochoa & Brother, Arturo González. The latter testified that the slips were not turned over to him by Sorbá. However, he explained the document existing in this case by saying that, at the hospital, a week before Sorbá's death and at his request, González drew up the said paper but that Sorbá died before he could sign it; that Sorbá said that he wanted to favor his daughter.

With the record and the analysis of the evidence made by the court below, we feel bound to find that the deposit slips only came into the hands of the trustee, perhaps mediately, by the intervention of the defendants. As the court found, and we agree, the document, not signed by Sorbá had no binding value.

We go a little further than the court and find that the defendants did not satisfactorily explain the existence of this document; that with the suspicious document in existence and its acceptance by the defendants they were bound to satisfy a judge, acting as a chancellor, of their non-participation in the fabrication of the document; likewise to justify their conduct in filing in the bankruptcy court a claim exclusively in the name of Marcelina Sorbá. The deduction is inevitable that the defendants intended to appropriate this $40,000 to their own use. No weight can be given to the claim of the defendants that they intended to divide with the plaintiffs.

Accepting as facts the seizing of the deposit slips and the exchange of them for the document, the defendants were guilty of fraudulent acts amounting to a conversion.

As we have seen, there was a probability if not a certainty that if the plaintiffs had had knowledge of the existence of the $40,000, they would have combined with the defendants to collect the same immediately. This is illustrated by another strong fact in the case. Sorbá had $64,000 in the Banco Territorial which in the testamentary proceedings was divided among all the heirs. It is almost unquestionable that a similar step would have been taken with respect to the $40,000. The probability if not the certainty is thus strengthened that the defendants intentionally concealed and attempted to appropriate the $40,000.

On the matter of concealment, as the lower court points out, the defendants kept up continuous family relations with the plaintiffs, and despite numerous opportunities to make the necessary communications, absolutely failed to give the plaintiffs any hint of the existence of the $40,000 or that the claim had been filed in the Federal Court in the name of Marcelina Sorbá.

Section 1249 of the Civil Code (Comp. Stat. 1911, sec. 4355) provides:

"In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract."

The principle herein expressed may be even more forcibly applied to fraudulent acts. Defendants put it out of the power of plaintiffs to make a claim against Ochoa before the latter was haled into the bankruptcy court. The subsequent act of Marcelina Sorbá in claiming the whole title to the $40,000 bears out the theory of a conversion by the defendants.

For over three years the defendants collected the interest on the $40,000 without giving notice of any kind to plaintiffs. Where one converts the interest, claims the principal, and conceals facts, as here, a conversion necessarily arises.

Conversion has been defined:

"Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein, such as a tortious taking of another's chattels, or any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of the possession permanently or for an indefinite time. The act must be essentially tortious, but it is not essential to conversion sufficient to support the action of trover that the defendant should have the complete manucaption of the property, or that he apply the property to his own use, if he has exercised dominion over it in exclusion of, in defiance of, or inconsistent with the owner's right." 26 R.C.L. 1098, par. 3, and cases cited.

"Conversion is 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.' The legal wrong denominated 'conversion' is any unauthorized act of dominion or ownership exercised by one person over personal property belonging to another in denial of, or inconsistent with, his right." 65 C.J. 11, par. 1, and cases cited.

While the facts of the cases cited under the foregoing texts are not so closely analogous as to bear direct citation, they do carry out the principle. We have no doubt, as re-

cited, that there was a conversion in accordance with the doctrine of the texts.

The conduct of defendants that we have characterized as conversion is merely a form of the fault (*culpa*) described in sec. 1802 of our Civil Code (1930 ed.).

■ We also notice the suggestion of the appellee that the actions of Viñas and his wife were those of an officious agent covered by section 1789 of the Civil Code (1930 ed.), which reads as follows:

"An officious manager must fulfill his charge with all the diligence of a good father of a family and indemnify for injuries which, through his fault or negligence, may be caused to the owner of the property or business he may be managing.

"Nevertheless, the courts may reduce the amount of the indemnity, according to the circumstances of the case."

As the defendants took possession of the fund, assumed the title thereto, they were bound to respond as any other officious manager; including especially the case that any notice to plaintiffs would in all probability have enabled them to recover the whole amount of the judgment.

We need not give especial heed to the attempts of the defendants to limit the recovery to the amounts they received directly, or from the trustees in bankruptcy.

We have avoided discussing the pleading or the admissions of the answer, or the errors one by one, because the total result is so plain.

The judgment should be affirmed.

Mr. Justice Aldrey took no part in the decision of this case.